# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Borough of Hollidaysburg,        :
               Petitioner     :
                                 :
              v.                 :     No. 739 C.D. 2023
                                 :
Paul Detwiler (Workers' Compensation :
Appeal Board),                 :
               Respondent   :     Argued: June 4, 2024

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE MATTHEW S. WOLF, Judge
                  HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION BY JUDGE WOLF               FILED:  November 19, 2024

The Borough of Hollidaysburg (Borough) petitions for review from a determination of the Workers' Compensation Appeal Board (Board), affirming an order of a Workers' Compensation Judge (WCJ) following remand, granting the Claim Petition filed by Paul Detwiler (Claimant).  For the reasons that follow, we affirm.

## BACKGROUND

On December 27, 2019, Claimant filed a Claim Petition seeking benefits for occupational disease pursuant to Section 108(r) of the Workers' Compensation Act (Act),[1] 77 P.S. § 27.1(r).[2]  The Claim Petition alleged that Claimant was diagnosed with chronic myeloid leukemia (CML) caused by his exposure to carcinogens categorized by the International Agency for Research on Cancer (IARC) as Group 1 carcinogens while working as a volunteer firefighter.

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

[2] Subsection (r) was added by the Act of July 7, 2011, P.L. 251 (hereinafter Act 46).

Claimant sought payment of the medical bills associated with his leukemia treatment. Certified Record (C.R.) at 59 (WCJ Decision, 8/24/22) (WCJ Decision at __), Finding of Fact (F.F.) No. 1.[3]  The Borough filed an Answer denying the averments in the Claim Petition. *Id.*, F.F. No. 2.

Before the WCJ, Claimant testified that he presently volunteers at Geeseytown Volunteer Fire Department (Geeseytown Fire Department) in Frankstown Township, Pennsylvania. He is also a social member of the Allegheny Township Volunteer Fire Company (Allegheny Township Fire Department). Claimant fought fires for the Allegheny Township Fire Department in the 1990s. He joined the Phoenix Volunteer Fire Department (Phoenix Fire Department or Phoenix) in the Borough of Hollidaysburg in 2003. *Id.*, F.F. No. 3. Claimant was a volunteer firefighter for the Phoenix Fire Department from 2003 to 2016. *Id.*, F.F. No. 4. During that period, he responded solely for the Phoenix Fire Department. *Id.* While a member of Phoenix, Claimant held the ranks of First Captain, Lieutenant, Captain, and Assistant Chief. *Id.*, F.F. No. 6.

Claimant testified there were four pieces of equipment at the Phoenix Fire Department, each with a diesel engine. There was no diesel emissions catcher system inside the Phoenix Fire Department firehouse during the time Claimant served. *Id.*, F.F. No. 7. Claimant would see or smell diesel emissions when the trucks started in the firehouse. When a call came in, the first operator would start the truck. The truck would then run for five to eight minutes. The garage door would be open at those times. *Id.*, F.F. Nos. 7-8. Claimant also stated that he was exposed to diesel emissions at emergency response scenes. He indicated that the trucks were always running. *Id.*, F.F. No. 9.

---

[3] The WCJ Decision is included at PDF pages 57 through 66 of the Certified Record. We cite the Certified Record using electronic PDF pagination.

2

During his time with the Phoenix Fire Department, Claimant fought brush fires, dumpster fires, house fires, "and every type of fire." *Id.*, F.F. No. 10. Claimant testified that he encountered burning furniture, household appliances, and everything else that would be involved in a fire. *Id.*

Claimant was involved in "attack, overhaul and salvage phases of fires." *Id.*, F.F. No. 11. He stated that he encountered smoke and soot during those phases of interior firefighting. *Id.* Claimant also stated that he encountered smoke and soot while performing exterior firefighting. He testified that the self-contained breathing apparatus (SCBA) was usually taken off when fighting fires outside. *Id.* at 60, F.F. No. 12. Claimant testified that when he was involved with overhaul or checking for hot spots, it was customary to "drop the mask and bumper coat." *Id.* Claimant stated that soot from a fire contaminates a fireman's gear. *Id.*, F.F. No. 13. Following a fire call, a fireman will hose off the gear, brush it off, and hang it out to dry. *Id.*

On cross-examination, Claimant testified he was sometimes the "engineer of the apparatus" but on other calls he might pull the hose off and "go into the building." *Id.*, F.F. No. 19. Claimant also indicated that he usually drove the ladder truck. *Id.* at 61, F.F. No. 25. Claimant could only recall operating as an interior firefighter at a fire at the Willowbrook Trailer Court in Allegheny Township, Pennsylvania. *Id.* at 60, F.F. No. 20. The fire occurred in the 1990s. He stated that call "[stood] out" because he grew up in the trailer park. *Id.* Claimant could not remember an incident where he wore the SCBA and fought an interior fire for the Phoenix Fire Department from 2010 to 2016. *Id.*, F.F. No. 21.

Claimant further stated that a firefighter assigned as an engineer or driver at a fire is also a pump operator. The pump is on the side of the truck opposite

3

from where the engine exhaust is. On other occasions, the operator is on the same side as the engine exhaust when operating switches. *Id.* at 61, F.F. No. 24.

Regarding his employment, Claimant testified that he has been in the truck repair business for his entire career. He worked at Metzler Brothers, Allegheny Truck, and Fox and James. Claimant has been the Facility Manager at Fox and James since 2006 or 2007. As Facility Manager, Claimant does not work on trucks. Claimant works in an office with a sealed glass window that looks into the shop and a closed hallway outside his office. *Id.* at 60, F.F. No. 16.

Claimant stated that he does not have any hobbies that involve painting or exposure to radiation. Further, his house was tested for radon "with no problems noted." *Id.*, F.F. No. 18. Claimant has no family history of cancer and, specifically, no family history of leukemia. *Id.*

Claimant was diagnosed with CML in December of 2014 by Dr. Bit-Shawish.[4] WCJ Decision at 64, F.F. No. 62. At the time of his diagnosis, Claimant told the Fire Chief but did not ask for an injury report and was not provided with one. At that point, Claimant was not thinking that his cancer was related to his fire service. *Id.* Claimant never asked Dr. Bit-Shawish if his cancer was related to his fire service. Furthermore, neither Dr. Bit-Shawish nor Claimant's family physician told Claimant that his cancer could be related to his fire service. *Id.*

Shortly before contacting counsel in January of 2019, Claimant attended a training in which the instructor spoke about the "the Firefighter's Cancer Law" (referring to Act 46). WCJ Decision at 60, 64, F.F. Nos. 15, 62. After learning that his cancer may be related to his firefighting, Claimant retained counsel. At counsel's direction, Claimant provided an Affidavit of his fire service to Dr. Tee L.

---

[4] Dr. Bit-Shawish's full name is not included in the Certified Record.

Guidotti, M.D. (Dr. Guidotti), a board-certified internist, pulmonologist, and occupational medicine specialist. *Id.* at 60, 63, F.F. Nos. 15, 46. Dr. Guidotti issued a report dated December 18, 2019, concluding that Claimant's cancer is causally associated with exposure to benzene. Claimant testified that this was the first time any doctor had related his cancer to his fire service. *Id.* at 60, F.F. No. 15.

Claimant offered Dr. Guidotti's report in support of his Claim Petition. Dr. Guidotti noted, *inter alia*, Claimant's history as a firefighter and history of exposure to diesel exhaust in the fire hall while starting engines before a run. Dr. Guidotti observed there were no exhaust extraction devices in the firehouses where Claimant served, with the exception of the Geeseytown Fire Department where Claimant is currently a member. Dr. Guidotti was also aware that Claimant did not use SCBA gear until he saw visible smoke. *Id.* at 63, F.F. Nos. 46-50.

Dr. Guidotti stated that benzene is among the toxic chemicals to which a firefighter is exposed. Further, fine particulate matter is produced by both fire and diesel exhaust. Dr. Guidotti stated that benzene is of particular importance in this case because of the known association between the chemical and myeloid malignancies. Exposure of firefighters to benzene has been quantified and found to vary between negligible to 22 parts per million. This exceeds the short-term exposure limit for benzene according to the Occupational Safety and Health Administration. Dr. Guidotti reviewed studies indicating that prolonged exposure to benzene, particularly at high levels, may be a risk factor for CML. Dr. Guidotti reviewed additional reports concluding that there was a statistically significant association between moderate exposure and risk of CML as well. He also noted that the IARC has concluded there is sufficient evidence in humans for the carcinogenicity of benzene and that the IARC recognizes that benzene causes acute

5

myeloid leukemia in adults. "This places benzene in Group 1 as a human carcinogen." WCJ Decision at 63, F.F. Nos. 51-54.

Dr. Guidotti ultimately concluded with a reasonable degree of medical certainty that CML is a type of cancer that can be caused by benzene, which is an IARC Group 1 carcinogen found in the firefighter work environment. He stated that in this case, Group 1 carcinogen exposure would have been a substantial contributing factor in the development of Claimant's cancer. *Id.* at 64, F.F. Nos. 55-56.

Claimant also offered records from his family physician indicating no cancer diagnosis prior to November 24, 2014. Claimant further related that he has not been in the military, he smoked from age 17 to 22, and his wife does not smoke. Claimant confirmed that firefighters did smoke in the Phoenix Fire Department firehouse from 2003 to 2016. *Id.* at 60, F.F. No. 17.

The Borough presented the deposition testimony of Eric Schmitt, Assistant Chief of the Phoenix Fire Department (Assistant Chief Schmitt). Assistant Chief Schmitt has been a member of the Phoenix Fire Department since 2004; however, he took a leave of absence from 2010 to 2015. Assistant Chief Schmitt testified that he was at one point tasked with entering fire incidents into the fire reporting system and ran the reports that were attached to his deposition (Response Reports). WCJ Decision at 61, F.F. Nos. 26-29. The Response Reports list the fire calls Claimant responded to from 2010 to 2016. *See* Reproduced Record (R.R.) at 193-238.[5] The entry for each incident includes a date, time, type code, a description of the incident (e.g., "Vehicle Fire," "Brush Fire," "Commercial Fire Alarm"), and

---

[5] We note that the Reproduced Record is not properly numbered as required in Pa.R.A.P. 2173 (reproduced record shall be numbered separately in Arabic figures followed by a small "a"). We will nevertheless refer to the page numbers as they have been set forth by the Borough.

6

the number of hours Claimant was present at that incident. R.R. at 198-203. The Response Reports also summarize the total amount of time Claimant spent responding to each type of incident and reflect that he participated in fighting dwelling fires for 39.98 hours over the years included in the Response Reports. WCJ Decision at 61, F.F. No. 30; R.R. at 204. Assistant Chief Schmitt explained that if the Phoenix Fire Department engaged in mutual aid with another fire department, that would be coded as an "assist" rather than as a dwelling fire. WCJ Decision at 61, F.F. No. 30.

Assistant Chief Schmitt did not have any personal recollection of Claimant fighting as an interior firefighter from 2004 to 2010 or 2015 through 2016. He did recall Claimant operating the apparatus and working on the exterior helping with tools, ladders, and moving hoses. Assistant Chief Schmitt indicated that an apparatus may be farther away where a hydrant is located; however, "even if a truck is fifty feet away from the burning structure[,] there could be heavy exposure to smoke dependent on the wind direction and the total smoke volume coming from the fire." WCJ Decision at 61-62, F.F. Nos. 31-33.

Assistant Chief Schmitt never personally observed Claimant ventilating or extinguishing a fire and never saw Claimant complete an overhaul. *Id.* at 62, F.F. No. 34. He also testified that he never saw Claimant cut holes for ventilation of fire during fire suppression or search for hidden fire during overhaul. *Id.* Finally, Assistant Chief Schmitt indicated that he never saw Claimant using SCBA at a fire. *Id.*, F.F. No. 35.

On cross-examination, Assistant Chief Schmitt testified that firefighters in the Phoenix Fire Department occasionally do not complete overhaul with a SCBA mask on. He also agreed that during the times he served with Claimant from 2004

7

to 2010 and 2015 to 2016, he did not respond to every call. Assistant Chief Schmitt indicated that no one responds to every call. *Id.* at 62, F.F. Nos. 35-38.

The Borough also presented the deposition testimony of Anthony DiBona, the current Chief of the Phoenix Fire Department (Chief DiBona). Chief DiBona was a member of the fire company through the entirety of Claimant's service from 2004 to 2016. Chief DiBona stated that he did observe Claimant at calls where there was fire and smoke, but he did not observe Claimant work as an interior firefighter. Chief DiBona further related that Claimant did not wear an air pack and, per Chief DiBona's recollection, only put on the air pack during training. WCJ Decision at 62, F.F. Nos. 39-41. Chief DiBona testified that trucks are always left running at incident locations and that firefighters at incident locations (as well as at the firehouse) are not provided breathing protection from diesel fumes. *Id.* at 62-63, F.F. No. 45.

Chief DiBona agreed that he worked to get a grant for a diesel fuel capture system so that the firefighters were not exposed to diesel exhaust from apparatus. He testified he knew diesel exhaust is hazardous. *Id.*, F.F. No. 44.

The WCJ found Claimant's testimony to be credible. He also found Assistant Chief Schmitt's and Chief DiBona's testimony credible, but not competent to establish that Claimant never engaged in interior firefighting including fire suppression and overhaul because Assistant Chief Schmitt and Chief DiBona "were not on every call that Claimant was on." WCJ Decision at 64, F.F. Nos. 57-58. In addition, the WCJ found the report of Dr. Guidotti to be competent and credible as it was well reasoned and unrebutted. *Id.*, F.F. No. 59.

The WCJ also addressed the issue of notice. The WCJ found that Claimant's CML diagnosis occurred in December of 2014 and that Claimant told the

8

Fire Chief of his diagnosis at that time; however, Claimant did not ask for an injury report and was not provided with one. At the time of his diagnosis, Claimant was not thinking that his cancer could be related to his fire service. The WCJ concluded that Claimant provided timely notice of his injury stating:

> [C]laimant never asked Dr. Bits-Shawish [sic] if his cancer was related to his fire service and neither Dr. Bits-Shawish [sic] [nor] Claimant's family physician, Dr. Dowlut[,] told him his cancer could be related to his fire service.
>
> [C]laimant attended a training in which the instructor, Neil Brokovich, spoke about [Act 46]. Claimant testified this training was shortly before he contacted counsel in 2019. [C]laimant never clearly testified when the training occurred. He testified he did not research and did not know if his cancer was related to firefighting following the training.
>
> The Notice of Workers' Compensation Denial in this matter provides that [Phoenix] had notice of the alleged work injury on January 18, 2019. [C]laimant testified he talked to his counsel before then. He completed an affidavit of his fire service and signed a fee agreement on February 5, 2019. When the December 18, 2019 Report of Dr. Guidotti was received, [Claimant] was advised by his counsel for the first time that his cancer could be claimed as related to his fire service. I find [Claimant] credible and accept his testimony that he did not know his cancer could be related to his fire service until he received training on [Act 46], and he acted with reasonable diligence to discover whether there was a connection between his cancer and his fire service thereafter.
>
> . . . .
>
> [Claimant] acted with reasonable diligence to determine whether there was a causal connection between his fire service and his cancer after he attended the training on [Act 46]. The [Borough] received notice of the injury on January 18, 2019, many months prior to the first medical

9

> opinion relating [C]laimant's firefighting duties to his cancer rendered by Dr. Guidotti on December 18, 2019.

WCJ Decision at 64-65, F.F. No. 62, Conclusion of Law No. 4 (citations omitted).

Thus, the WCJ held that Claimant met his burden under Section 108(r) of the Act to establish the causal link between his type of cancer and a Group 1 carcinogen. The WCJ further held that Claimant's Claim Petition should be granted because he met his burden to establish that he served four or more years in continuous firefighting duties; had direct exposure to a Group 1 carcinogen; and passed a physical examination prior to asserting a claim or prior to engaging in firefighting duties, which examination failed to reveal any evidence of cancer, thus satisfying Section 301(f) of the Act, 77 P.S. § 414.[6]

On appeal, the Board affirmed.[7] The Borough then petitioned this Court for review.[8]

## ISSUES

Before this Court, the Borough argues Claimant did not provide timely notice of his occupational disease; did not file a timely Claim Petition; failed to establish that he served four or more years in continuous firefighting duties; and

---

[6] Added by Section 2 of the Act of July 7, 2011, P.L. 251.

[7] Chairman Alfonso Frioni, Jr. dissented, stating that he believed Claimant did not prove by substantial competent evidence "continuous active firefighting duties or exposures prior to the time period he was diagnosed with cancer in December 2014." C.R. at 106 (Board Opinion, 6/14/23), at 21. The word "active" does not appear in Section 301(f) of the Act, 77 P.S § 414.

[8] "[This Court's] review is limited to determining whether the WCJ's findings of fact were supported by substantial evidence, whether an error of law was committed[,] or whether constitutional rights were violated." *Bristol Borough v. Workers' Comp. Appeal Bd. (Burnett)*, 206 A.3d 585, 595 n.6 (Pa. Cmwlth.) (en banc), *appeal denied*, 217 A.3d 802 (Pa. 2019).

10

failed to meet his burden to show a causal link between his cancer and a Group 1 carcinogen.

## THE LAW

### A. Proof of Occupational Disease

In a claim petition proceeding, the claimant bears the burden of establishing the right to compensation and all of the elements necessary to support an award. *Rife v. Workers' Comp. Appeal Bd. (Whitetail Ski Co.)*, 812 A.2d 750, 754 (Pa. Cmwlth. 2002). Section 301(a) of the Act, 77 P.S. § 431, provides that "[e]very employer shall be liable for compensation for personal injury to . . . each employe, by an injury in the course of his employment . . . ." Section 301(c)(2) of the Act, 77 P.S. § 411(2), defines the phrase "injury arising in the course of his employment" to include an "occupational disease," as that term is defined under Section 108 of the Act, 77 P.S. § 27.1.[9] Thus, an injury satisfying the definition of "occupational disease" under Section 108 is a compensable injury under the Act.

The Act creates a series of evidentiary presumptions and shifting burdens of proof. Though it has several moving parts, this statutory framework is clearly set out in the Act and our courts have well explained how the Act's presumptions work.[10] But given Employer's arguments and the Dissent,[11] we review the framework here, emphasizing the law as it applies in the specific circumstances of this case.

---

[9] Added by Section 1 of the Act of October 17, 1972, P.L. 930.

[10] *See City of Phila. Fire Dep't v. Workers' Comp. Appeal Bd. (Sladek)*, 195 A.3d 197, 207 (Pa. 2018); *Burnett*, 206 A.3d at 595-617 (discussing and applying *Sladek*).

[11] *Borough of Hollidaysburg v. Detwiler*, __ A.3d __ (Pa. Cmwlth., No. 739 C.D. 2023, filed November 19, 2024) (Leavitt, S.J., dissenting) (Dissent).

11

*1. The Section 301(f) Presumption and Burdens of Proof*

Section 301(e) of the Act[12] establishes a first-level presumption of causation. It states:

> If it be shown that the employe, at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, *it shall be presumed that the employe's occupational disease arose out of and in the course of his employment, but this presumption shall not be conclusive.*

77 P.S. § 413 (emphasis added). The Section 301(e) presumption, which applies automatically based on employment, gives a claimant a rebuttable "evidentiary advantage" in showing that his disease is work related. *City of Wilkes-Barre v. Workmen's Comp. Appeal Bd. (Zuczek)*, 664 A.2d 90, 92 (Pa. 1995). Our Supreme Court has explained:

> The Act was amended in 2011 [by Act 46] to add two provisions, Sections 108(r) and 301(f), dealing specifically with firefighters claiming benefits for cancer alleged to be caused as a result of performing the duties of firefighters. Generally, reading the sections together, the statutory framework for litigation of claims for workers' compensation benefits by firefighters afflicted with cancer proceeds in discrete stages. Initially, the claimant must establish that he or she has an "occupational disease," as that term is defined in Section 108(r). Next, to establish an evidentiary presumption of entitlement to compensation in accordance with section 301(f), the claimant must establish that he or she
>
> > (1) served four or more years in continuous firefighting duties;

---

[12] Section 301(e) was added by the Act of October 17, 1972, P.L. 930, No. 223.

12

(2) had direct exposure to a Group 1 carcinogen; and

(3) passed a physical examination prior to asserting a claim or prior to engaging in firefighting duties (and the examination failed to reveal any evidence of cancer).

77 P.S. § 414. Finally, if the claimant succeeds in demonstrating an occupational disease and an entitlement to the evidentiary presumption of compensability, then the burden of proof shifts to the employer, who must offer "substantial competent evidence that shows that the firefighter's cancer was not caused by the occupation of firefighting." *Id.*

*Sladek*, 195 A.3d at 207 (cleaned up).

Thus, Act 46 added a second "presumption of compensability" under Section 301(f) specifically, in addition to the presumption under Section 301(e). The Section 301(f) presumption is at issue here. The first three sentences of Section 301(f)[13] explain how that presumption works. The first sentence sets up a three-

---

[13] For ease of reference, the entire text of Section 301(f) of the Act is as follows:

[First sentence] Compensation pursuant to cancer suffered by a firefighter shall only be to those firefighters who have served four or more years in continuous firefighting duties, who can establish direct exposure to a carcinogen referred to in [S]ection 108(r) relating to cancer by a firefighter and have successfully passed a physical examination prior to asserting a claim under this subsection or prior to engaging in firefighting duties and the examination failed to reveal any evidence of the condition of cancer. [Second sentence] The presumption of this subsection may be rebutted by substantial competent evidence that shows that the firefighter's cancer was not caused by the occupation of firefighting. [Third sentence] Any claim made by a member of a volunteer fire company shall be based on evidence of direct exposure to a carcinogen referred to in [S]ection 108(r) as documented by reports filed pursuant to the Pennsylvania Fire Information Reporting System and provided that the member's claim is based on direct exposure to a carcinogen referred to in [S]ection 108(r). [Remaining sentences] Notwithstanding the limitation under subsection (c)(2) with respect to disability or death resulting from an occupational disease having to occur within three hundred weeks after the last date of employment in an occupation or industry to which a claimant was exposed

**(Footnote continued on next page…)**

13

prong test that every firefighter must meet to obtain the Section 301(f) presumption—years of service, exposure to a carcinogen, and no preexisting cancer. The second sentence allows the employer to rebut the presumption if it is triggered. The third sentence imposes an "additional requirement on volunteer firefighters" about the type of evidence they must use to satisfy the second prong of the test required in the first sentence.[14] *Burnett*, 206 A.3d at 601.

The test in Section 301(f)'s first sentence has three prongs, which our courts have always treated as analytically independent of each other. *See Sladek*, 195 A.3d at 207 (listing elements separately); *Burnett*, 206 A.3d at 601 (same). <u>Prong 1</u> requires the firefighter to show that he has "*served* four or more years *in* continuous firefighting duties." 77 P.S. § 414 (emphasis added). Our research discloses no decisional law suggesting that one must be a "traditional firefighter" or engage in particular kinds of firefighting duties in order to satisfy the continuous-service requirement. Indeed, it appears that all this prong requires is that the claimant show he "*was a firefighter* for four or more continuous years." *Sladek*, 195 A.3d at 216 n.1 (Mundy, J., concurring and dissenting) (emphasis added).

---

to the hazards of disease, claims filed pursuant to cancer suffered by the firefighter under [S]ection 108(r) may be made within six hundred weeks after the last date of employment in an occupation or industry to which a claimant was exposed to the hazards of disease. The presumption provided for under this subsection shall only apply to claims made within the first three hundred weeks.

77 P.S. § 414 (boldface references added).

[14] The third sentence is the only part of Section 301(f) that applies to volunteer firefighters specifically. Whether this is better described as an "additional" burden on volunteer firefighters, or merely as specific limiting instruction about what kind of evidence a volunteer firefighter must use to prove the exposure that any firefighter must show, makes no analytical difference. *But see Burnett*, 206 A.3d at 601 ("additional requirement"); *Detwiler*, __ A.3d at __, Dissent at 3-4 (listing report requirement as a fourth prong of the test for the Section 301(f) presumption when the test is applied to volunteer firefighters).

Prong 2 of the first sentence demands—separately—that the claimant prove direct exposure to a carcinogen. In the case of volunteer firefighters, the third sentence of Section 301(f) requires this proof to be "based on" PennFIRS[15] reports. This does not require the claimant to submit the PennFIRS reports themselves. A report prepared internally by the fire company, if it "denotes [the claimant's] participation in incidents involving exposure to fire smoke likely to contain . . . Group 1 carcinogens causally related to [his cancer], . . . is sufficient to satisfy the PennFIRS reporting requirements in Section 301(f)." *Burnett*, 206 A.3d at 603. Prong 3 requires a showing that no preemployment physical disclosed preexisting cancer, which is not disputed here.

If a claimant makes this three-prong showing (including, for volunteer firefighters, a sufficient PennFIRS-like report) then the Section 301(f) presumption applies and "the burden of proof shifts to the employer" to rebut the presumption as stated in the second sentence of Section 301(f). *Sladek*, 195 A.3d at 207.

In evaluating evidence on appeal, we note that the WCJ is the ultimate fact-finder and has "exclusive authority over questions of credibility and evidentiary weight…." *A & J Builders, Inc. v. Workers' Comp. Appeal Bd. (Verdi)*, 78 A.3d 1233, 1238 (Pa. Cmwlth. 2013) (quoting *Anderson v. Workers' Comp. Appeal Bd. (Penn Ctr. for Rehab)*, 15 A.3d 944, 949 (Pa. Cmwlth. 2010)). The WCJ's authority over questions of credibility, conflicting evidence, and evidentiary weight is unquestioned. *Id.* The WCJ may accept or reject the testimony of any witness, including an expert witness, in whole or in part. *Id.* The Board, and this Court, are bound by the WCJ's findings of fact provided they are supported by substantial

---

[15] PennFIRS is "Pennsylvania's version of the National Fire Reporting System (NFIRS)." *Burnett*, 206 A.3d at 592. "As part of PennFIRS, there is a report completed by a volunteer fire company or the fire company that responds to an incident or event," but "the report contains no evaluation of the carcinogens found at a particular fire scene." *Id.*

evidence. *Lindermuth v. Workers' Comp. Appeal Bd. (Strishock Coal Co.,)*, 134 A.3d 111, 125 (Pa. Cmwlth. 2016). Neither this Court nor the Board may disregard a WCJ's credibility determinations, or substitute findings of fact for those made by the WCJ with their own. *RAG (Cyprus) Emerald Res., L.P. v. Workers' Comp. Appeal Bd. (Hopton)*, 912 A.2d 1278, 1286 (Pa. 2007).

### 2. Section 301(f) Time Limitations

The last two sentences of Section 301(f) set a two-tiered time limitation. A firefighter who does not file his claim within 300 weeks of the last date of exposure to a Group 1 carcinogen loses the benefit of the presumptions in Section 301(f) and of the Act. *See Fargo v. Workers' Comp. Appeal Bd. (City of Phila.)*, 148 A.3d 514, 519-20 (Pa. Cmwlth. 2016). If a firefighter does not file his claim until more than 600 weeks after the last date of exposure, he is foreclosed from bringing the claim in its entirety. *Id.*

### B. Notice of Occupational Disease

The time in which to file a claim is distinct from the time in which a claimant must give his employer notice of his injury. Pursuant to the Act, notice is a prerequisite for receiving workers' compensation benefits, and the claimant bears the burden of showing that proper notice was given. *City of Pittsburgh v. Workers' Comp. Appeal Bd. (Flaherty)*, 187 A.3d 1061, 1066 (Pa. Cmwlth. 2018). The timing of notice is governed by Section 311 of the Act, 77 P.S. § 631. Pertinent here, Section 311 provides that a claimant must give notice within 120 days of either the date of the injury or the date at which the claimant "knows, or by the exercise of reasonable diligence should know, of the existence of the injury and its possible relationship to his employment." The *Flaherty* Court recognized:

> [F]or the clock to start on Section 311's notice period, a layperson-claimant must have more than just an

uninformed suspicion about her disease's work-relatedness. In other words, a claimant does not "know" of the possible relationship between a disease and work until she is so informed by a medical expert. To hold otherwise would require a claimant to "sort through her many symptoms unassisted and essentially diagnose herself." *Sell* [*v. Workers' Comp. Appeal Bd. (LNP Eng'g.)*], 771 A.2d [1246, 1252 (Pa. 2001)].

*Id.* at 1068-69; *Cf. E. Hempfield Twp. v. Workers' Comp. Appeal Bd. (Stahl)*, 189 A.3d 1114, 1119 (Pa. Cmwlth. 2018) (while sufficient knowledge for purposes of notice requires more than a claimant's suspicion, to hold that the 120-day notice period can only begin once a claimant receives a physician's confirmation would be illogical).

In *Stahl*, 189 A.3d at 1117-18, this Court observed:

The discovery rule under Section 311 allows that "employees who suffer an injury that is not readily and immediately ascertainable have the same rights under the Act as those employees who sustain an injury . . . as long as they proceed with reasonable diligence." *Sell*[, 771 A.2d at 1251]. The standard of reasonable diligence requires "a reasonable effort to discover the cause of an injury under the facts and circumstances present in the case." *Id.* (quoting *Cochran v. GAF Corp.*, [666 A.2d 245, 249 (Pa. 1995)]) (internal quotations omitted). While reasonable diligence is an objective standard, "it is sufficiently flexible to take into account the different capacities people have to deal with the circumstances they confront." *Id.* In order to trigger the running of the 120-day period for notice, a claimant must have: (1) knowledge or constructive knowledge, (2) of a disability, (3) which exists, (4) which results from an occupational disease or injury, and (5) which has a possible relationship to the employment. *Allegheny Ludlum Corp. v. Workers' Comp. Appeal Bd. (Holmes)*, 998 A.2d 1030, 1034 (Pa. Cmwlth.), *appeal denied*, [13 A.3d 480 (Pa. 2010)].

*Id.* at 1117-18. Thus, while timely notice can be given within 120 days of a firefighter's receipt of a medical report establishing a possible causal relationship between the firefighter's cancer and the occupation of firefighting, it does not nullify the reasonable diligence requirement of Section 311 of the Act.

## DISCUSSION

### A. Notice of Occupational Disease

Initially, the Borough argues that the facts of this case do not reflect that Claimant acted with reasonable diligence in giving the Borough notice of his occupational disease. The Borough contends that Claimant should have known of the possible connection between his cancer and his service as a firefighter when he first became aware of Act 46. Claimant testified that it was not until his training with fire instructor Brokovich that he became aware of the possible connection; however, Claimant could neither pinpoint the date that the training occurred, nor did he provide certification of his attendance at the training. The Borough posits that "[b]ecause it is clear that this training with fire instructor [Brokovich] was the triggering event that led Claimant to provide notice, he was burdened with proof that the training was within 120 days of the date he gave notice [(i.e., January 18, 2019)]." Borough's Brief at 14. The Borough maintains that Claimant failed to meet this burden.

In response, Claimant highlights his testimony that, at the time of his diagnosis, he did not think that his cancer was related to his firefighting. Furthermore, Claimant did not ask his doctors if there was a connection between his firefighting and his cancer, nor did his doctors advise him of any connection. The WCJ found that Claimant credibly testified he had no indication that his cancer could be connected to firefighting until he attended training with instructor Brokovich in

18

early 2019. Claimant in turn contacted counsel and thereafter provided notice to the Borough on January 18, 2019.

Based on our review of the record, the WCJ did not err in finding that Claimant acted with reasonable diligence or that he provided the Borough with timely notice of his occupational disease. To the extent the Borough argues that Claimant failed to act when he first became aware of Act 46's existence, this Court has previously rejected such arguments. *See Flaherty*, 187 A.3d at 1069 (Court refused to "use Act 46 to impute to the claimant actual knowledge that her injury could possibly be work[ ]related"); *City of Erie v. Workmen's Comp. Appeal Bd. (Shannon)*, 607 A.2d 327 (Pa. Cmwlth. 1992), *aff'd sub nom. Shannon v. City of Erie*, 631 A.2d 595 (Pa. 1993) (holding that knowledge of Act 46's effect did not perfect notice onto an employer).

The Borough's argument amounts to nothing more than a challenge to the WCJ's credibility determinations. The WCJ credited Claimant's testimony that although he knew of his CML diagnosis in 2014, he did not relate it to firefighting at that time. The WCJ further found Claimant credible when he testified that within a month or so of attending the Act 46 training with instructor Brokovich, Claimant contacted counsel and received paperwork to make his claim. Thereafter, Claimant provided notice to the Borough on January 18, 2019, and signed a fee agreement with counsel on February 5, 2019. Claimant's credible testimony supports the WCJ's conclusion that Claimant acted with reasonable diligence when he notified the Borough of his claim shortly after attending the Act 46 training and making contact with his attorney. We are bound by the WCJ's credibility determinations on appeal.

19

*Lindermuth*, 134 A.3d at 125. Thus, we conclude that the Borough's argument is without merit.[16]

## B. Timeliness of the Claim Petition under Section 301(f)

Next, the Borough challenges whether Claimant brought his claim within 300 weeks (5.75 years) of his last day of exposure, thereby entitling him to the presumption set forth in Section 301(f) of the Act. In this regard, the Borough argues that Claimant did not prove his last date of exposure to the hazard that caused his cancer.

Claimant responds that his testimony, found credible by the WCJ, established that he was volunteering for the Borough, with routine exposures, throughout his tenure with the Phoenix Fire Department. Claimant filed his Claim Petition on December 27, 2019—well within the 300-week period required to receive the presumptions.

We agree with Claimant. The last date in which Claimant could have been exposed, and still benefited from the 301(f) presumption, is March 28, 2014—300 weeks before filing the claim petition. As the Board explained "[a]lthough the WCJ did not make a specific finding as to the date of Claimant's last exposure, he did accept Claimant's testimony" that he was exposed to fires from 2003 through 2016 while volunteering with Phoenix. The Board concluded that "[e]ven if it assumed that Claimant last worked with Phoenix on January 1, 2016 and last had exposure on that date, he still filed his December 27, 2019 claim within 300 weeks of that date." *Id.* The Board's assumption is correct, albeit unnecessary. The

---

[16] We further reject the Borough's argument that it was necessary for Claimant to provide the exact date of the Act 46 training to prove timely notice. As we previously noted, Claimant's credible testimony that he contacted counsel shortly after the Act 46 training was sufficient to meet Claimant's burden of showing timely notice to the Borough. *See* R.R. at 27.

20

Response Reports entered into the record indicate that Claimant responded to at least fifteen incidents coded "F" for fire after March 28, 2014:[17] (1) a dwelling fire on February 1, 2015; (2) a dwelling fire on March 1, 2015; (3) a dwelling fire on April 1, 2015; (4) a dumpster/trash fire on April 5, 2015; (5) a brush/grass fire on April 18, 2015; (6) a commercial building fire on August 18, 2015; (7) a dwelling fire on August 19, 2015; (8) a commercial building fire on September 16, 2015; (9) a vehicle fire on October 14, 2015; (10) a vehicle fire on January 14, 2016; (11) a dumpster/trash fire on February 21, 2016; (12) a dwelling fire on June 4, 2016; (13) a commercial building fire on July 19, 2016; (14) a brush/grass fire on July 26, 2016; and (15) a brush/grass fire on September 11, 2016. R.R. 198-203. Accordingly, Claimant's December 27, 2019 Claim Petition was brought within the 300-week timeframe necessary to receive the Act's presumptions.

### C. Proof under Section 301(f)

#### 1. Continuous Service

The Borough next asserts that Claimant failed to establish the requirements necessary to trigger Section 301(f)'s statutory presumption. First, it argues that Claimant failed to prove that he served four or more years in continuous firefighting duties with Phoenix. The Borough submits that although Claimant was qualified as a firefighter by training, the testimony of Assistant Chief Schmitt and Chief DiBona established that "Claimant was not the traditional firefighter that one might envision when thinking of a firefighter." Borough's Brief at 22. Pointing to those testimonies, and the frequency and type of Claimant's response to fires as

---

[17] The coding system on the Response Reports has a key indicating: F=Fire, M=EMS/Medical, R=Rescue, O=Other. The Reports also use various other acronyms to detail the incidents in more detail. Assistant Chief Schmitt testified that calls responding to a fire are not always coded F. See R.R. 104 (explaining that response to a mutual aid dwelling fire would be coded as "assist").

21

reflected in the Response Reports, the Borough argues that Claimant's testimony overstated his fire service and provides "no indication that he was exposed to fire smoke or carcinogens at any fire." *Id.* at 23.

The Borough's argument is rife with factual statements unsupported by the record and exhibits a misunderstanding of the burden Section 301(f) places on a claimant. Factually, there is no dispute that Claimant served as a volunteer firefighter with Phoenix from 2003 through 2016 and responded to fire calls during that time.[18] *See* Borough's Brief at 23. Claimant testified that those years of service were "as a firefighter," including "[fighting] fire *and* mak[ing] emergency responses," and the WCJ credited that testimony.[19] R.R. at 10-11; WCJ Decision at 59, 64, F.F. Nos. 4, 57. There was no break in Claimant's 13-year service to Phoenix, and thus he has, beyond peradventure, satisfied 301(f)'s four-year continuous service requirement.

Nevertheless, the Borough focuses, incorrectly, on the frequency and type of Claimant's responses to fires over the relevant period in an attempt to paint him as less than a "traditional firefighter." The type of incidents to which Claimant responded, and the frequency thereof, is related to Claimant's potential for direct exposure, as contemplated not in the first prong of Section 301(f)'s test, but the second. This argument mixes legislative apples with oranges. While the Borough

---

[18] We note that the Response Reports indicate Claimant's participation in incidents from 2010 through 2016, but have a gap from 2012 through 2013. However, the Response Reports are required to document only "direct *exposure* to a carcinogen;" they are not required to show "continuous firefighting duties." Section 301(f) of the Act, 77 P.S. § 414 (emphasis added).

[19] In its brief, the Borough concedes that Claimant had the qualifications of a firefighter during his service with Phoenix, but does not expressly state that he responded to calls. *See* Borough's Brief at 22-23. At oral argument, however, counsel for the Borough noted Claimant's testimony that he operated the fire truck and conceded that Claimant went on runs with the truck in responding to calls while serving with Phoenix.

raises this point under the guise of Claimant's purportedly inadequate "continuous firefighting duties," a proper reading of Section 301(f)'s first prong shows that the "continuous" requirement relates to *years of service* in firefighting duties. Simply put, the continuous nature relates to the *time period served*, not, as suggested by the Borough, the *type* of firefighting duties or the *frequency* of those duties throughout the period of service.[20] *See Sladek*, 195 A.3d at 216 n.1 (Mundy, J., concurring and dissenting) (requiring claimant to show he "was a firefighter for four or more *continuous years*") (emphasis added). It is essential to keep the two concepts straight because they apply to different aspects of the legislation.

The Borough's argument is more accurately characterized as a challenge to whether Claimant established sufficient causation between his work as a volunteer firefighter with Phoenix and his CML. To properly address this

---

[20] The Dissent would hold there is insufficient evidence of record "to support the [WCJ's] legal conclusion that Claimant was engaged in four or more years of continuous firefighting duties before he was diagnosed with cancer." *Detwiler*, __ A.3d at __, Dissent at 17. Highlighting the frequency (or infrequency) of Claimant's response to emergencies while serving Phoenix, the Dissent would find that Claimant's testimony and the Response Reports show that Claimant did not engage in *enough* firefighting to benefit from the 301(f) presumption. This position contains the same defects as the Borough's argument. First, the WCJ's determination as to Claimant's continuous firefighting duties involves a factual finding which deserves more deference than the Dissent is willing to give. *A & J Builders*, 78 A.3d at 1238. As explained above, there is sufficient, credible evidence of record to establish Claimant served as a firefighter for Phoenix continuously from 2003-2016.

Second, the Dissent's interpretation improperly conflates the first and second prong of the Section 301(f) test and places a heightened evidentiary burden on Claimant to establish continuous service that is not supported by the language of the statute. In the Dissent's view, to establish four or more years "in continuous firefighting duties," a claimant would need to prove not only consecutive, unbroken years of service, but also (1) participation in a certain (yet statutorily undefined) type of firefighting duties, and (2) participation in that type of firefighting duties at a certain (yet statutorily undefined) frequency. This is simply not the applicable statutory framework. This heightened burden appears nowhere in the statute. *Compare* 77 P.S. § 414, *with* C.R. at 106 (Board Opinion, 6/14/23), at 21 (dissenting chairman interpreting Section 301(f) to require "continuous *active* firefighting duties") (emphasis added), and *Detwiler*, __ A.3d at __, Dissent at 9, 10, 13, 15 (Dissent interpreting Section 301(f) to require interior or traditional firefighting duties).

argument, we turn to the second prong of the 301(f) test, which requires a claimant to provide evidence of direct exposure, and then the second sentence of 301(f), which permits an employer to provide rebuttal evidence to challenge the presumption of compensability.

## 2. *Direct Exposure*

The second prong of 301(f)'s test for the presumption requires a claimant to "establish a direct exposure to a carcinogen referred to in [S]ection 108(r) relating to cancer by a firefighter." The relevant carcinogen in this case is benzene. The Borough argues that "there is no indication that [Claimant] was exposed to fire smoke or carcinogens at any fire." Borough's Brief at 23.

The evidence in this record, credited by the WCJ, shows Claimant carried his burden to establish direct exposure. While the Borough makes much of the WCJ crediting the testimonies of Chief DiBona and Assistant Chief Schmitt, it specifically ignores the WCJ's finding that their testimonies were "not competent to establish [C]laimant never engaged in interior firefighting including fire suppression and overhaul because [Assistant Chief] Schmitt and [Chief] DiBona were not on every call that [C]laimant was on." WCJ Decision at 64, F.F. No. 58.[21] And the parts of their testimonies that are competent do support the WCJ's findings about exposure. Chief DiBona testified that he directly saw Claimant present at calls where fire and smoke were present during his service with Phoenix. R.R. at 137

---

[21] The Borough also highlights Claimant's recollection of a fire at Willowbrook Trailer Court in the 1990s. R.R. 42-43. Claimant explained that fire stood out to him because he grew up there. *Id.* at 43. While not specifically described, Claimant testified that he fought other fires during his time with Phoenix, and this credited testimony is supported by the Response Reports. R.R. 198-203. Moreover, a review of the other testimonies in this case show that there is nothing unusual about remembering specific fires from long ago. For example, Assistant Chief Schmitt could only recall interior firefighting alongside Chief DiBona during a fire that occurred before 2003. *Id.* at 117-19 (Schmitt Dep. at 27-29).

24

(DiBona Dep., 6/12/2020, at 47). Assistant Chief Schmitt testified that Claimant worked on the exterior of fire scenes and could have been exposed to smoke in those roles. R.R. at 108-09 (Schmitt Dep., 6/12/2020, at 18-19). Moreover, Claimant's testimony was credited without exception, and he stated that during his tenure with Phoenix, he fought "brush fires, dumpster fires, house fires, just every type of fire"; that he encountered burning furniture, household appliances, and everything else that would be involved in a fire; that he was involved in attack, overhaul, and salvage phases of fires; and that he also encountered smoke and soot doing exterior firefighting. R.R. at 18-21.

Consistent with all of this testimony, and as required by the third sentence of Section 301(f), the Response Reports "denote[] [Claimant's] participation in incidents involving exposure to fire smoke likely to contain . . . Group 1 carcinogens causally related to [his cancer]." *Burnett*, 206 A.3d at 603. This satisfies the PennFIRS reporting requirement. Further, when combined with Claimant's and others' testimonies regarding his exposure, the Response Reports are substantial evidence to support the WCJ's finding that Claimant showed direct exposure to a Group 1 carcinogen.[22] *See id*. This assumes, of course, that Dr. Guidotti's expert opinion substantially supports a connection between exposure to fire smoke and exposure to a Group 1 carcinogen. We turn now to address what expert evidence is needed to invoke the Section 301(f) presumption, and at what stage of litigation a challenge to causation becomes appropriate.

---

[22] The Dissent's position writes in a frequency requirement to 301(f)'s second prong. But by its plain terms, the second prong requires only "direct exposure to a carcinogen." Concerns over whether "occasional" or "infrequent" exposure should result in compensation are again, really questions of causation. *See Detwiler*, __ A.3d at __, Dissent at 17 ("Occasional firefighting will not produce the high levels of benzene exposures that are required, according to Dr. Guidotti, to cause CML.").

### 3. Causation, Expert Testimony, and the Act

Expert testimony is relevant in firefighter claims to show general causation under Section 108(r), which in this case requires Claimant to establish a link between his CML and a Group 1 carcinogen. *See, e.g.*, *Sladek*, 195 A.3d at 208 ("[E]pidemiological evidence is clearly relevant and useful in demonstrating general causation."). The Borough does not appear to challenge the aspect of Dr. Guidotti's report linking CML and a Group 1 carcinogen.[23]

Instead, the Borough argues Dr. Guidotti's report is not sufficient to support the Section 301(f) presumption because it is based on assumptions which are contrary to the established facts of record; specifically, that Claimant was "actively engaged in the typical phases of fighting fires." Borough's Brief at 30. To paraphrase, the Borough contends that if Claimant was not performing "traditional" firefighting duties, he could not have been exposed to a Group 1 carcinogen.[24]

Expert testimony is relevant for the Section 301(f) presumption in potentially two different ways. First, it is relevant to showing direct exposure required to initially invoke the presumption. To do this, the expert must bridge the scientific gap between the substances a claimant was exposed to and "a [Group 1 carcinogen.]" Section 301(f) of the Act, 77 P.S. § 414 (referring back to Section 108(r)). This essentially mirrors the general-causation requirement under Section

---

[23] Despite the Borough's silence, the Dissent sometimes verges on raising the issue *sua sponte*, commenting that Dr. Guidotti's report only "strongly implies" a causal connection between benzene and CML. *Detwiler*, __ A.3d at __, Dissent at 8. But the Dissent ultimately concedes the causal connection. *See id.* at __, Dissent at 8 (quoting the report stating "benzene is causally associated with CML), 10 ("benzene [is] the Group 1 carcinogen identified as a cause of CML").

[24] The Borough also intimates that Dr. Guidotti's opinion wrongly assumed that Claimant was not exposed to potentially carcinogenic chemicals at his day job. *See* Borough's Brief at 32. But as we discuss below, the Borough did not present any evidence to rebut the presumption of compensability. We reject this attempt at back-door rebuttal evidence via a challenge to the competency of Dr. Guidotti's opinion on this basis.

26

108(r), given Section 301(f)'s cross-reference to that Section. It "is not a heavy burden." *Sladek*, 195 A.3d at 208. *Sladek*'s principal holding was that Section 301(f) does *not* require claimants to prove that workplace exposure actually caused their cancer or that their direct exposure was to some *particular* Group 1 carcinogen. The Supreme Court reversed this Court's "add[ition of] a workplace-exposure requirement that the General Assembly chose not to impose upon claimants." *Id.* at 210 (Wecht, J., concurring and dissenting).

Dr. Guidotti's report meets the presumption's low burden. The WCJ credited his report as competent, credible, well-reasoned, and unrebutted. WCJ Decision at 64, F.F. No. 59. Dr. Guidotti's exposure assessment appears on pages 2 through 4 of his report. R.R. 65-67. Therein, he details Claimant's firefighting duties at length. The Borough's argument is, again, prefaced on its preferred version of the facts, which is not reflective of the WCJ's credibility determinations. Claimant's testimonial evidence, supported by the Response Reports and on which Dr. Guidotti relied in his report, is substantial and sufficient to show his exposure to fire smoke, as we have discussed. Dr. Guidotti opined that "benzene is present in fire smoke" and the firefighter working environment. *Id.* at 68. The WCJ accepted that unrebutted opinion as fact. WCJ Decision at 54, F.F. No. 56. That expert opinion is sufficient to sustain the burden a claimant must meet to invoke the Section 301(f) presumption.[25]

---

[25] The Dissent challenges the factual foundations of Dr. Guidotti's report, referring to it as "boilerplate of all his reports on behalf of firefighter claimants, simply recited information about firefighters in the abstract, not Claimant in particular." Dissent at 10. But our review of the report reveals Dr. Guidotti's exposure assessment was based on this specific Claimant's firefighting service. *See* R.R. 65-67 That two paragraphs in Dr. Guidotti's exposure assessment section began with the phrase "like other firefighters" does not indicate that he misunderstood the nature of Claimant's firefighting service or that his opinion does not support a finding that this Claimant had a direct exposure. R.R. 65.

There is a second and distinct way that expert testimony becomes relevant for purposes of Section 301(f). Expert testimony becomes relevant, and arguably most important, in cases like *Sladek*, where the employer attempts to rebut the 301(f) presumption. After the presumption is triggered, 301(f)'s second sentence provides an opportunity for the employer to challenge the presumed causal link between the volunteer firefighter's service and his cancer and allows the employer, through expert testimony, to prove a non-occupational cause. *See Sladek*, 195 A.3d at 210 ("To reach the stage of the proceedings at which the employer attempts to rebut the presumption of employment-related causation, the claimant has already carried his or her Section 108(r) burden of proof that his or her cancer is of a type that *may* be caused by a Group 1 carcinogen.") (emphasis added).

But this is not a rebuttal case like *Sladek*. Here, the Borough never attempted to rebut the presumption Claimant successfully invoked. Instead, the Borough makes its argument on the front end, challenging whether Claimant invoked the Section 301(f) presumption in the first place. This is a presumption case. Scrutinizing the nature of expert testimony and distinguishing general from specific causation are the hallmarks of rebuttal cases, *see Sladek*,[26] but are simply

---

[26] There is an unsettled question whether general-causation evidence can be used to rebut the presumption, but that is of course limited to rebuttal. *Compare Sladek*, 195 A.3d at 209 ("[W]here the claimant has established an entitlement to the evidentiary presumption of compensability under Section 301(f), [] epidemiological evidence is not sufficient to rebut the presumption."), *with id.* at 211 (Wecht, J., concurring and dissenting) ("I would hold that an expert's general causation testimony regarding epidemiological studies if credited by a WCJ, may prove the required lack of causation."). No majority of the Justices joined Part II of the opinion in *Sladek*, where the Court discussed rebuttal. *Id.* at 210. A majority of the Justices *did* join Part I of the *Sladek* opinion, which held that a claimant's initial burden to invoke the presumption is met by "demonstrating *general* causation." *Id.* at 208 (emphasis added).

28

and obviously not at issue here.[27] The Borough's concern of overboard compensation is misplaced. Triggering the 301(f) presumption does not write the benefits check. The blockbuster action on causation occurs on rebuttal and between experts. Here, the Borough did not avail itself of that statutory tool, and the presumption of compensability stands. We will not conflate invoking the presumption with rebutting it, as the Borough invites us to do.

## CONCLUSION

Claimant provided the Borough with timely notice of his occupational disease and filed a timely claim petition. The WCJ properly concluded that Claimant met his burden under Section 108(r) of the Act to establish a causal link between his CML and a Group 1 carcinogen and satisfied the elements necessary to invoke the presumption of compensability in Section 301(f) of the Act. A reversal would necessarily require a lack of deference to factual findings by the WCJ.

---

[27] The Dissent, for its part, would require the parties to prove specific causation between the cancer and the claimant's occupation in order to show an occupational disease and trigger the presumption, which all but defeats its purpose. That was this Court's precise approach to the first issue in *Sladek*, which the Supreme Court reversed. *Sladek*, 195 A.3d at 208 (holding occupational disease is shown by demonstrating general causation). Such an approach should not be countenanced here.

The Dissent's causation concerns are significant on a policy level but are misplaced in this case. We agree that a member of a volunteer fire department who only cooks the chili on Sundays should not be entitled to the 301(f) presumption on the basis of his membership in the department. *See Detwiler*, __ A.3d at __, Dissent at 12 ("Section 301(f) of the Act requires more than membership in a volunteer fire department for four years in order for a firefighter to take advantage of the statutory presumption."). Those facts are not before us. Moreover, a proper application of 301(f) assuages the Dissent's precise concern without elevating a claimant's burden (in some amorphous way) beyond what the statute requires. Indeed, the second prong of the 301(f) test takes care of the above hypothetical by requiring Claimant to establish direct exposure to a Section 108(r) carcinogen. If a claimant cannot show any direct exposure, the presumption will not trigger.

29

Accordingly, the order of the Board is affirmed.


_____
MATTHEW S. WOLF, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Borough of Hollidaysburg,               :
                              Petitioner :
                                         :
       v.                                :      No. 739 C.D. 2023
                                         :
                                         :
Paul Detwiler (Workers' Compensation     :
Appeal Board),                           :
                             Respondent  :

# **O R D E R**

AND NOW, this 19th day of November 2024, the June 14, 2023 order of the Workers' Compensation Appeal Board is AFFIRMED.


_____
MATTHEW S. WOLF, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Borough of Hollidaysburg,              :
                    Petitioner         :
                                       :
        v.                             :    No. 739 C.D. 2023
                                       :    Argued:  June 4, 2024
Paul Detwiler (Workers'                :
Compensation Appeal Board),            :
                    Respondent         :

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MATTHEW S. WOLF, Judge
           HONORABLE MARY HANNAH LEAVITT, Senior Judge

DISSENTING OPINION
BY SENIOR JUDGE LEAVITT                 FILED:  November 19, 2024

        The Workers' Compensation Appeal Board (Board) awarded Paul Detwiler (Claimant) workers' compensation benefits for chronic myeloid leukemia, concluding that his cancer was caused by his work as a volunteer firefighter with the Phoenix Volunteer Fire Department, which serves the Borough of Hollidaysburg (Employer).[1]  In reaching this conclusion, the Board used the statutory presumption set forth in Section 301(f) of the Workers' Compensation Act (Act), 77 P.S. §414,[2] that assists a firefighter in proving that his cancer is work related.  Because Claimant's evidence did not satisfy the threshold requirements for the Section 301(f) presumption, I respectfully dissent from the majority's decision to affirm the Board.

---

[1] For purposes of workers' compensation benefits, volunteer firefighters are deemed to be employees of the municipality in which their volunteer fire company is located.  *See* Section 601(a)(1) of the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended*, added by the Act of December 5, 1974, P.L. 782, 77 P.S. §1031(a)(1).  Accordingly, Employer is liable for the workers' compensation claims of the volunteer firefighters of the Phoenix Volunteer Fire Department.

[2] Added by the Act of July 7, 2011, P.L. 251, *as amended*.

## Statutory Presumption for Occupational Diseases

This Court has summarized the key elements of a workers' compensation claim as follows:

> *An injured employee* seeking to obtain workers' compensation benefits for a work-related injury *bears the burden of proving all elements necessary to support an award* . . . . Pursuant to Section 301(c)(1) of the Act, 77 P.S. §411(1), an employee's injuries are compensable if they (1) arise in the course of employment and (2) are causally related thereto[.]

*Amandeo v. Workers' Compensation Appeal Board (Conagra Foods)*, 37 A.3d 72, 75 n.4 (Pa. Cmwlth. 2012) (emphasis added) (citations omitted). Section 301(c)(2) of the Act states that a compensable "injury" includes "occupational disease as defined in section 108 of this act[.[3]]" 77 P.S. §411(2).

Section 108 of the Act provides a list of occupational diseases, one of which is "[c]*ancer suffered by a firefighter which is caused by exposure to a known carcinogen* [that] is recognized as a Group 1 carcinogen by the International Agency for Research on Cancer." Section 108(r) of the Act, 77 P.S. §27.1(r) (emphasis added). Section 301(e) of the Act establishes a presumption for employees asserting an occupational disease claim. It states:

> If it be shown that the employe, at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, *it shall be presumed that the employe's occupational disease arose out of and in the course of his employment*, but this presumption shall not be conclusive.

---

[3] Added by Section 1 of the Act of October 17, 1972, P.L. 930.

MHL-2

77 P.S. §413 (emphasis added). In short, mere employment in an occupation or industry in which the occupational disease is a hazard triggers a presumption that the employee's disease is work related.

There is a separate presumption for the occupational disease of cancer suffered by a firefighter. Section 301(f) of the Act states, in pertinent part, as follows:

> Compensation pursuant to cancer suffered by a firefighter shall only be *to those firefighters who have served four or more years in continuous firefighting duties, who can establish direct exposure to a carcinogen referred to in section 108(r) relating to cancer by a firefighter and have successfully passed a physical examination prior to asserting a claim* under this subsection or prior to engaging in firefighting duties and the examination failed to reveal any evidence of the condition of cancer. The presumption of this subsection may be rebutted by substantial competent evidence that shows that the firefighter's cancer was not caused by the occupation of firefighting. *Any claim made by a member of a volunteer fire company shall be based on evidence of direct exposure to a carcinogen referred to in section 108(r) as documented by reports filed pursuant to the Pennsylvania Fire Information Reporting System and provided that the member's claim is based on direct exposure to a carcinogen referred to in section 108(r).*

77 P.S. §414 (emphasis added). Mere employment as a firefighter does not trigger the Section 301(f) presumption, as is the case for the Section 301(e) presumption. Rather, a volunteer firefighter must prove: (1) that he worked at least four years in "continuous firefighting duties;" (2) that he had direct exposure to a carcinogen recognized as a Group 1 carcinogen by the International Agency for Research on Cancer (IARC); (3) that he had a physical examination prior to his firefighting that did not reveal evidence of cancer; and (4) that his direct exposure to the Group 1 carcinogen is documented by reports filed pursuant to the Pennsylvania Fire

Information Reporting System (PennFIRS). Only where the evidence establishes all four prerequisites can the volunteer firefighter employ the Section 301(f) presumption to establish that his cancer is work related.

Section 301(f) of the Act imposes a two-tiered time limitation on the filing of Section 108(r) claims. "First, a claimant must file the claim *within 300 weeks of the last date of work with exposure* to a known Group 1 carcinogen; if the claimant fails to do so, he is not foreclosed from bringing a claim by Section 301(f), but he loses the statutory presumption of Sections 301(e) and 301(f)." *Fargo v. Workers' Compensation Appeal Board (City of Philadelphia)*, 148 A.3d 514, 520 (Pa. Cmwlth. 2016) (emphasis added). Second, "if the claimant does not file the claim until more than 600 weeks after the date of *the last workplace exposure*, the claimant is foreclosed from bringing that claim in its entirety." *Id.* (emphasis added). The last date of exposure to a Group 1 carcinogen is critical to the determination of whether a claim has been timely filed.

Finally, "[n]otice of a work-related injury is a prerequisite to receiving workers' compensation benefits, and the claimant bears the burden of showing that proper notice was given." *East Hempfield Township v. Workers' Compensation Appeal Board (Stahl)*, 189 A.3d 1114, 1117 (Pa. Cmwlth. 2018). Section 311 of the Act requires a claimant to give the employer notice within 120 days of either the date of the injury or the date at which the claimant "knows, or by the exercise of reasonable diligence should know, of the existence of the injury and its possible relationship to his employment." 77 P.S. §631.[4] "The discovery rule under Section

---

[4] Section 311 of the Act states:

> Unless the employer shall have knowledge of the occurrence of the injury, or unless the employe or someone in his behalf, or some of the dependents or someone in

311 allows that 'employees who suffer an injury that is not readily and immediately ascertainable have the same rights under the Act as those employees who sustain an injury . . . as long as they proceed with reasonable diligence.'" *Stahl*, 189 A.3d at 1117-18 (quoting *Sell v. Workers' Compensation Appeal Board (LNP Engineering)*, 771 A.2d 1246, 1251 (Pa. 2001)). In order to trigger the 120-day deadline for a claimant to give notice to the employer, "a claimant must have: (1) knowledge or constructive knowledge, (2) of a disability, (3) which exists, (4) which results from an occupational disease or injury, and (5) which has a possible relationship to the employment." *Stahl*, 189 A.3d at 1118.

Employer argues that Claimant's evidence did not satisfy either the threshold requirements for the Section 301(f) presumption or the statutory deadlines for filing a timely claim petition. Claimant responds that the Board's adjudication should be affirmed because it is consonant with the record evidence and applicable legal principles.

**Claimant's Evidence**

On December 27, 2019, Claimant filed a claim petition alleging that he suffered an occupational disease, *i.e.*, chronic myeloid leukemia (CML). Claimant's petition alleged that he was exposed to "IARC group one carcinogens as a volunteer

---

their behalf, shall give notice thereof to the employer within twenty-one days after the injury, no compensation shall be due until such notice be given, and, unless such notice be given within one hundred and twenty days after the occurrence of the injury, no compensation shall be allowed. However, in cases of injury resulting from ionizing radiation or any other cause in which the nature of the injury or its relationship to the employment is not known to the employe, the time for giving notice shall not begin to run until the employe knows, or by the exercise of reasonable diligence should know, of the existence of the injury and its possible relationship to his employment. The term "injury" in this section means, in cases of occupational disease, disability resulting from occupational disease.

77 P.S. §631.

firefighter." Certified Record (C.R.), Item 2 at 1. The claim petition identified December 1, 2014, as both the date of his cancer onset and the last date of his exposure to a Group 1 carcinogen.

At the hearing before the Workers' Compensation Judge (WCJ), Claimant testified that he served as a volunteer firefighter with the Phoenix Volunteer Fire Department (Phoenix) from 2003 until May of 2016, when he joined the Geeseytown Volunteer Fire Department.[5] Claimant testified about the notice of his injury given to Employer on January 18, 2019. Notice of Compensation Denial, 1/31/2019, at 2; Reproduced Record at 241 (R.R. __). He explained that, initially, he told his fire chief about his cancer diagnosis in 2014. Notes of Testimony, 1/22/2020, at 35 (N.T. __); R.R. 35.[6] Sometime after he joined Geeseytown, Claimant attended a training session offered by the State Fire Commissioner's Office and learned that firefighters diagnosed with cancer may be eligible for compensation benefits. Thereafter, he contacted an attorney about filing a cancer claim. Claimant did not "know the exact days" between attending the training session and contacting an attorney. N.T. 28; R.R. 38. Claimant estimated that "[i]t was probably a month o[r] so." *Id.*[7]

Claimant testified about his service with Phoenix. He stated that Phoenix averaged 500 calls a year and that he responded to approximately half of

---

[5] Prior to serving with Phoenix, Claimant was a member of the Allegheny Township Fire Department located in Duncansville, Pennsylvania.

[6] The reproduced record does not comport with Pennsylvania Rule of Appellate Procedure 2173, PA.R.A.P. 2173 (requiring that the pagination of reproduced records be in the form of an Arabic number followed by a small "a"). The reproduced record has omitted the small "a."

[7] The WCJ found that "Claimant discovered in late 2018 or early 2019 that the Firefighter's Cancer Law might apply to his cancer." WCJ Decision, 8/24/2022, at 4, Finding of Fact No. 15. Employer argues that it is not known when Claimant attended the training session because he never produced the training certificate, as he promised to do in his testimony.

them.  N.T. 12; R.R. 12.  Claimant stated that he "fought all different types of fires[,]" such as "brush fires, dumpster fires, [and] house fires[.]" N.T. 18; R.R. 18. He engaged in the "attack, overhaul, and salvage phases" of interior firefighting, N.T. 19; R.R. 19, during which "he encountered smoke and soot[.]"  N.T. 19-20; R.R. 19-20.  Claimant explained that overhaul is when the firefighter enters the building "pulling down, checking for hot spots and making sure that . . . all the hot spots are out."  N.T. 21; R.R. 21.

At the time of his cancer diagnosis, Claimant was employed as a facility manager at Fox & James, working in the truck maintenance and repair division. Claimant testified that he did not repair trucks; rather, he spent most of his day in his office.  Claimant testified that he rarely entered the repair shop where he might be exposed to diesel fumes.  Neither Phoenix nor Fox & James had installed systems to capture diesel fumes.

In his testimony, Claimant did not specify how many of the 500 calls in which he participated involved fires; nor did he estimate the number of fires he fought or identify the exposures they involved.  On cross-examination, Claimant recalled a single interior fire in which he was involved in suppression and overhaul and that was in the 1990s when he belonged to another volunteer fire company.  N.T. 42-43; R.R. 42-43.  Claimant could not remember a single instance of putting on a Self-Contained Breathing Apparatus (SCBA) to fight a fire while at Phoenix.  He could not recall a single fire between 2010 and 2016 at which he did attack, overhaul and salvage.[8]  N.T. 43; R.R. 43.

_____

[8] Fire Chief Anthony DiBona testified that he saw Claimant put on his SCBA on one occasion and that was during a HAZMAT training.  DiBona Dep. at 48; R.R. 138.  Similarly, Assistant Fire Chief Eric Schmitt testified that he never saw Claimant wearing an SCBA.  Schmitt Dep. at 22; R.R. 112.

Claimant presented a report from Tee L. Guidotti, M.D., M.P.H., D.A.B.T., which stated, *inter alia*, that "[l]ike all firefighters," Claimant worked in "fire suppression (ventilation and extinguishing the fire) and overhaul (examination of the fire and extinguishing burning embers)." R.R. 65. "Like other firefighters," Claimant was "exposed to diesel exhaust in the fire hall while starting engines before a run[.]" *Id.*

Dr. Guidotti's report stated that "benzene is present in fire smoke" and is "causally associated with CML." R.R. 68-69. His report explained that

> [*t*]*he source of the most toxic chemical exposures routinely encountered in firefighting is generally combustion*, including lignocellulosic material (wood and paper) but particularly of synthetic polymers, which make available chlorine for halogenations of many combustion products, producing, among other toxic chemical products, dioxins and furans. *Other products of combustion* include polycyclic aromatic hydrocarbons, some of which are known carcinogens, *volatile organic compounds, including benzene, a potent carcinogen*[.]

R.R. 66 (emphasis added). Stated otherwise, the combustion of wood and synthetic polymers generate the "most toxic chemical exposures."[9] *Id.*

In his report, Dr. Guidotti noted that "IARC does not make a definitive determination that benzene is a cause of CML" but strongly implies this connection. R.R. 70.[10] He further observed as follows:

> Firefighters are exposed to levels of benzene that are not necessarily low, strictly speaking, but are lower than the levels observed in China in the 1990's [sic]. In the absence of

---

[9] The report stated that diesel exhaust contains carcinogens but did not specify that one of them is benzene. R.R. 66. It did specify "nitroarenes" and particulates are found in diesel exhaust. *Id.*

[10] A publication of IARC states that with respect to benzene, "*the evidence in humans is limited for* non-Hodgkin lymphoma, chronic lymphoid leukaemia, multiple myeloma, *chronic myeloid leukaemia*, and acute myeloid leukaemia in children[.]" R.R. 90 (emphasis added).

cumulative exposure studies of firefighters, the closest approximation available in the literature would be the intermittent, relatively (but not necessarily in absolute terms) low exposure of short duration experienced by petroleum workers.

*It is my considered opinion*, held to a reasonable degree of medical certainty, that the evidence available today is sufficient to conclude that *high-level exposure to benzene*, as demonstrated in the Chinese studies, *causes chronic myelogenous leukemia*, as Dr. Mehlman proposes.

Extrapolation to lower levels of exposure is approximated by petroleum workers, especially those involved in transportation. This occupation has a similar profile of intermittent, significant exposure, repeated over several years is found among petroleum workers. These workers have an elevated risk of CML but the relationship is complicated.

Thus, on the basis of the available data, recognizing that it rests on an incomplete understanding of the benzene effect, it is my considered opinion, held to a reasonable degree of medical certainty, that the evidence available today is sufficient to conclude that *benzene exposure at levels relevant to firefighting are causally associated with increased risk of chronic myelogenous leukemia*. This conclusion is compatible with that of IARC, although IARC did not directly address this issue.

*Id*. (emphasis added).

Employer argues that Claimant's evidence did not establish the prerequisites of Section 301(f) of the Act. Accordingly, Claimant is not entitled to the statutory presumption.

First, Claimant did not prove that his service at Phoenix constituted "continuous firefighting duties." 77 P.S. §414. Claimant could not describe any particular fire while he was with Phoenix. The only interior fire Claimant could specify was at Willowbrook Trailer Court that occurred in the 1990s, before he joined Phoenix. The written records of Phoenix show that Claimant responded to 53 calls in 2010, 4 in 2011, 2 in 2014, 91 in 2015, and 50 in 2016, and few calls

involved fires of any type. R.R. 193-97. Employer notes that Claimant exaggerated both the number of calls to Phoenix and his participation level at 250 per year. During Claimant's 2010-2016 service with Phoenix, the documentation shows that only six calls, in which he participated, were designated dwelling fires.[11] R.R. 198-203. Of the six, only one fire occurred before Claimant's cancer diagnosis. Claimant presented no evidence that he was exposed to fire, smoke, or carcinogens at any of these fires, let alone a report from PennFIRS confirming his direct exposure to benzene.

Second, Employer contends that the report of Dr. Guidotti was not competent to establish either Claimant's firefighting duties or his exposure to benzene, the Group 1 carcinogen identified as a cause of CML. Dr. Guidotti did not speak to Claimant; did not examine Claimant; and did not take a history from Claimant. Noting that Dr. Guidotti's report is largely a boilerplate of all his reports on behalf of firefighter claimants, Employer observes that the instant report recited information about firefighters in the abstract, not Claimant in particular.

Third, Employer argues that Claimant's evidence did not satisfy the statutory deadlines for his claim. To begin, Claimant's evidence did not establish his last date of direct exposure to a Group 1 carcinogen. Indeed, the WCJ did not make a finding of fact on Claimant's last date of exposure to a Group 1 carcinogen that could cause CML. Claimant remembered a single interior fire that could have produced benzene, and it took place in the 1990s, which is outside the 600-week deadlines in Section 301(f) of the Act. Claimant was diagnosed with CML in December of 2014. Four years later, on January 18, 2019, Claimant gave notice to

---

[11] Those fires were on January 25, 2011 (4.93 hours), February 1, 2015 (0.43 hours), March 1, 2015 (2.65 hours), April 1, 2015 (0.72 hours), August 19, 2015 (0.08 hours), and June 4, 2016 (0.38 hours). R.R. 199-202.

MHL-10

Employer of the possible relationship between his cancer and volunteer fire service. Employer argues that Claimant did not prove that he notified Employer within 120 days of discovering the possible connection of his volunteer firefighting to his cancer, *i.e.*, the training that took place sometime between 2016 and 2019, after he joined Geeseytown Volunteer Fire Department. The WCJ found that Claimant discovered the possible connection between firefighting and his cancer "shortly before" he gave notice to Employer. WCJ Decision, 8/24/2022, at 8, Finding of Fact No. 62. Employer argues that this finding of fact does not satisfy the precise 120-day statutory deadline for giving notice of a work injury.

## Continuous Firefighting Duties and Exposure to Benzene

The Act does not define the term "continuous firefighting duties" as used in Section 301(f). Generally, where words are defined in a statute, those definitions are binding. *Pennsylvania Associated Builders and Contractors, Inc. v. Department of General Services*, 932 A.2d 1271, 1278 (Pa. 2007). In the absence of a statutory definition, courts construe words according to their "common and approved usage." 1 Pa. C.S. §1903(a). This usage may be "ascertained from a dictionary definition." *Fugh v. Unemployment Compensation Board of Review*, 153 A.3d 1169, 1175 (Pa. Cmwlth. 2017). Lest words be rendered surplusage, "[e]very statute shall be construed, if possible, to give effect to all its provisions." 1 Pa. C.S. §1921(a); *Chuk v. State Employees' Retirement System*, 885 A.2d 605, 613 (Pa. Cmwlth. 2005). Additionally, "[a]lthough one is admonished to listen to what a statute says[,] one must also listen attentively to what it does not say.'" *Young v. Pennsylvania Board of Probation and Parole*, 189 A.3d 16, 21 (Pa. Cmwlth. 2018) (quoting *Commonwealth v. Giulian*, 141 A.3d 1262, 1268 (Pa. 2016)).

"Continuous" is defined as "marked by uninterrupted extension in space, time, or sequence." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 270 (11th ed. 2003), also available at https://www.merriam-webster.com/ dictionary/continuous (last visited November 12, 2024). "Firefighting" is defined as "the activity of stopping fires burning." CAMBRIDGE ONLINE DICTIONARY, available at https://dictionary.cambridge.org/us/dictionary/english/firefighting (last visited November 12, 2024). DiBona testified that firefighting requires putting on "SCBA turnout gear, fighting fires, [and doing] overhaul." DiBona Dep. at 60; R.R. 150. Additionally, it requires that firemen do "search and rescue and pull apart walls and put water on fire[.]" DiBona Dep. at 61; R.R. 151. It is not disputed by the parties that the attack, overhaul, and salvage phases of fighting a fire constitute firefighting duties.

Section 301(f) of the Act requires more than membership in a volunteer fire department for four years in order for a firefighter to take advantage of the statutory presumption. *Cf.* Section 301(e) of the Act, 77 P.S. §413. Work in the office, for example, does not constitute firefighting, *i.e.*, "stopping fires burning." Further, the firefighting must be "continuous," not occasional, over the four-year period.

Rather than attempt a definition of "continuous firefighting duties," the majority evades this duty by deflection.

First, the majority states that the "continuous requirement relates to years of service," not firefighting duties. *Borough of Hollidaysburg v. Detwiler (Workers' Compensation Appeal Board)*, __ A.3d __, __ (Pa. Cmwlth., No. 739 C.D. 2023, filed November 19, 2024), slip. op. at 23 (Majority). This moves the adjective "continuous" from modifying "firefighting duties" to modifying "four or more

years," and it replaces the word "continuous" with "consecutive." This sleight of hand violates the rules of grammar and common word usage, by which courts are bound. 1 Pa. C.S. §1903(a).

Second, the majority states that the Act does not specify the type and frequency of firefighting duties while conceding firefighting is not "cooking chili on Sundays." Majority, __ A.3d at __ n. 27, slip op. at 29 n. 27. This is just another way of saying that "continuous firefighting duties" has not been defined by the legislature. The majority then notes that the parties do not dispute that Claimant responded to "fire calls" but does not acknowledge another point not disputed by the parties: firefighting involves attack, overhaul and salvage and interior and exterior fires. DiBona Dep. at 60-61; R.R. 150-51. In *City of Philadelphia Fire Department v. Workers' Compensation Appeal Board (Sladek)*, 195 A.3d 197, 200 (Pa. 2018), for example, the claimant participated in "fighting hundreds of exterior and interior fires" and "regularly was exposed over time to, inter alia, smoke, soot, ash, and diesel emissions, as well as second-hand smoke in the firehouses." The claimant was left with soot in his "nose, hair, clothes, and gear." *Id*. This constitutes "continuous firefighting duties." However, four years of service with a volunteer fire department in some capacity, whether doing traffic control or cooking chili, does not constitute four years of "continuous firefighting duties."

Here, Claimant's testimony lacks any of the detail provided by the claimant's testimony in *Sladek*. Claimant described his service at Phoenix in broad strokes. He did not state how many hours per day or days per month he volunteered at Phoenix. He did not estimate how many fires he stopped during his time with Phoenix or the nature of his participation in that activity. When asked for specifics, Claimant could not remember fighting a single building fire while a volunteer with

Phoenix. He could, however, provide specifics on a fire he attended in the 1990s. DiBona was a member of Phoenix for the entirety of Claimant's service and testified that he never saw Claimant at a fire engaging in suppression or overhaul. DiBona Dep. at 47-48; R.R. 137-38. Schmitt also testified that he had no recollection that Claimant ever engaged in interior firefighting duties.[12] Schmitt Dep. at 15; R.R. 105. Their testimony was credited.

DiBona stated that Claimant worked principally as a driver of the fire engine or rescue truck. His duties depended "upon which truck he would take." DiBona Dep. at 50; R.R. 140. If he drove a rescue truck, his duty was to provide scene lighting. If he drove the fire engine, his duty was to operate the pump. *Id*. In either case, DiBona explained that a driver stays with the truck. DiBona Dep. at 54; R.R. 144. Schmitt described Claimant's duties as performing "exterior work," that is, helping with tools, ladders and hoses. Schmitt Dep. at 15; R.R. 105. Claimant agreed that he drove firetrucks at Phoenix but stated that his work was "a mix" without specifics. N.T. 41; R.R. 41. The WCJ found that the only fire Claimant attended where he performed suppression and overhaul was in the 1990s, before his service with Phoenix. WCJ Decision, 8/24/2022, at 4, Finding of Fact No. 20.

As noted by the WCJ, DiBona and Schmitt were not present at every fire. Indeed, as Schmitt noted, no firefighter is present at every fire. However, it was not Employer's burden to prove a negative. It was Claimant's burden to prove that his service consisted of "continuous firefighting duties." Section 301(f) of the

---

[12] Schmitt has been a member of Phoenix since 1984. In 2010, he left Phoenix and returned in 2015. Schmitt Dep. at 8-9; R.R. 98-99.

Act, 77 P.S. §414. Claimant offered no witnesses to fill in the gaps in his account of his firefighting duties at Phoenix.[13]

The volunteer firefighter must also present "evidence of direct exposure to a carcinogen" as "documented by reports filed pursuant to [PennFIRS.]" Section 301(f) of the Act, 77 P.S. §414. Phoenix maintained staff activity reports for each volunteer, showing the type of incidents in which the volunteer firefighter participated. *See* R.R. 198-203. The activity reports do not show "direct exposure" to the carcinogen that causes CML, benzene, because they do not document regular interior fires, let alone Claimant's attendance thereto. *See Sladek*, 195 A.3d at 200 (the claimant was "regularly" exposed to fire smoke). The majority acknowledges that "benzene is present in fire smoke." Majority, __ A.3d at __, slip op. at 27 (quoting Dr. Guidotti's report at R.R. 68).

In 2010, Phoenix received 374 calls, and Claimant responded to 53 of them. R.R. 193. Those calls included motor vehicle crashes, fluid/debris cleanup, fire alarms,[14] and emergency medical services. R.R. 198-99. Only three calls in which Claimant participated involved a fire. They included one brush/grass fire

---

[13] Dr. Guidotti's report stated that Claimant worked in fire suppression and overhaul at interior fires but did not specify that he did this work at Phoenix. R.R. 65. In any case, Dr. Guidotti did not have any independent knowledge of Claimant's duties. He did not review Claimant's employment files or speak with anyone at Phoenix on the type of fires to which Phoenix responded or about Claimant's role at those fires. Simply, Dr. Guidotti's report does not establish that Claimant spent four years in "continuous firefighting duties" at Phoenix.

Likewise, the reports sent by Phoenix to the PennFIRS Reporting System do not verify "continuous firefighting duties" by Claimant. They report few fire calls of any type, let alone the nature of Claimant's participation.

[14] DiBona testified that "high occupancy fire" is a code used to identify alarms at apartment complexes or elderly living facilities. He explained that "typically" these types of calls do not "require [the fire department] to make it on the scene before [receiving] a call [] from a 9-1-1-center" that the call was a false alarm, and no help was needed. DiBona Dep. at 53-54; R.R. 143-44.

MHL-15

(0.03 hours); one vehicle fire (0.52 hours); and two cooking fires (0.23 hours and 0.28 hours). *Id*. The nature of his participation at any of these fires is unknown.

In 2011, Phoenix received 280 calls, and Claimant responded to 4 of them. R.R. 194. The four calls were for emergency medical services, one "dwelling fire," an "outside investigation," and a "commercial fire alarm." R.R. 199. The nature of Claimant's participation in the dwelling fire is unknown.

In 2012 and 2013, Phoenix did not track its calls and volunteer participation. Claimant did not fill in this gap in the documentary record with either testimony or other documentary evidence about fires to which Phoenix responded for the years 2012 and 2013, let alone his participation in any that occurred.

In 2014, Phoenix received 402 calls, and Claimant responded to 2: a motor vehicle crash and an alarm for a high occupancy fire. R.R. 195, 199. That same year, Claimant was diagnosed with CML.

In 2015, Phoenix received 390 calls, and Claimant responded to 91. R.R. 196. Those incidents included quick response service, commercial fire alarm, lift assist, inside/outside investigation, high occupancy fire, tree/wire down, motor vehicle crash, traffic control, public service, and training. R.R. 199-202. Only three incidents, in which Claimant participated, involved fire: a dwelling fire, a dumpster fire, and a brush/grass fire. *Id*. Again, the nature of his participation is unknown.

In 2016, Phoenix received 560 calls, and Claimant responded to 50. R.R. 197. The 50 incidents involved public service, traffic control, motor vehicle crashes, and lift assists. R.R. 202-03. Three calls were for brush and grass fires, but the nature of Claimant's participation is unknown.

Claimant did not testify about the role he performed at any of the fire calls in which he participated. He did not refute the account of DiBona and Schmitt

that he drove the engine or rescue truck and did exterior work, such as moving ladders. The WCJ found that Claimant "usually drove the ladder truck." WCJ Decision, 8/24/2022, at 5, Finding of Fact No. 25. Phoenix's reports to PennFIRS do not demonstrate Claimant's direct exposure to a Group 1 carcinogen because they record infrequent fire calls, almost none of which involved a burning building. Notably, Claimant testified that he encountered smoke and soot in the interior fires, not at other types of fires. N.T. 20; R.R. 20.

The documentary evidence that must be considered on a volunteer firefighter's exposure does not make Claimant's case for the Section 306(f) presumption. The Phoenix data established intermittent fires and only one dwelling fire, in 2011, in which Claimant participated, in some unknown fashion. The documents are missing for 2012 and 2013, but Claimant did not attempt to fill in that gap with testimonial evidence. Simply, the reports submitted by Phoenix to PennFIRS do not show that Claimant engaged in "continuous firefighting duties" that included "exposures" to benzene at the high levels needed to cause CML.

Dr. Guidotti's report states that firefighters, including Claimant, are exposed to diesel exhaust "while starting engines before a run." R.R. 65. Nowhere does this report suggest that diesel exhaust generates levels of benzene sufficient to cause CML. Rather, it is a *fire-associated* carcinogen, benzene, that bears a causal connection to CML. The report specifies that "intense exposure levels despite the availability of SCBA" occur in the course of encountering fires. R.R. 66. The report is definite that it is exposure "to levels of *fire-associated* Group 1 carcinogens, specifically benzene, in sufficient levels" that is "associated with a substantial risk of CML." R.R. 71 (emphasis added). The report referred to "fires," not diesel

exhaust, and it nowhere suggested that occasional participation in firefighting would generate "sufficient levels" of benzene to cause CML.

The evidence needed to prove "direct exposure to a carcinogen" is defined by the volunteer firefighter's own expert report. Here, Dr. Guidotti's report established that exposure to high levels of benzene is needed to cause CML. It also established that benzene is found in fire smoke. To meet his burden on exposure, Claimant was required to establish that his firefighting duties consisted of stopping fires on a regular, not occasional, basis in order to prove direct exposure to benzene in sufficient levels to create a risk of CML. He failed to satisfy this prerequisite to the statutory presumption.

## Conclusion

It goes without saying that we are bound by the factual findings of the WCJ, including all credibility determinations. Nevertheless, the credited evidence and factual findings of the WCJ must be sufficient to support the legal conclusion that Claimant was engaged in four or more years of continuous firefighting duties that exposed him to a Group 1 carcinogen. I agree with the dissent of Board Chairman Alfonso Frioni, Jr., that Claimant's evidence did not "demonstrate[] continuous active firefighting duties or exposures" to a Group 1 carcinogen prior to his diagnosis of "cancer in December of 2014." Board Adjudication at 21.

Claimant's evidence is marked by lacunae. Phoenix's volunteer activity records identify one dwelling fire in which Claimant participated in 2011, prior to his cancer diagnosis, but not the nature of his participation. Claimant may have driven the fire engine or may have entered the building during suppression and overhaul. He did not say. There are no documents prior to 2010, and Claimant did not fill in the gap with other evidence. The documentary evidence for the years 2010

MHL-18

to 2016 demonstrates that Phoenix's fire calls were infrequent, and there is no basis to believe that they were more frequent prior to 2010. Claimant offered no evidence that occasional firefighting will produce the high levels of benzene exposures that are required, according to Dr. Guidotti, to cause CML. This insufficient evidence is the responsibility of Claimant, who bore the burden of proof.

If the General Assembly had intended that four years of membership in a volunteer fire department would trigger the presumption in Section 301(f), it would have so stated. Instead, it requires "four years of continuous firefighting duties" and direct exposure to Group 1 carcinogens. Section 301(f) of the Act, 77 P.S. §414.

Because Claimant's evidence about his work as a volunteer firefighter did not prove four years of continuous firefighting duties that exposed him to benzene at levels sufficient to cause CML, he was not entitled to use the presumption provided in Section 301(f) of the Act. Accordingly, I would reverse the adjudication of the Board.[15]

_____
MARY HANNAH LEAVITT, President Judge Emerita

---

[15] Because Claimant did not establish either four years of continuous firefighting duties or direct exposure to benzene, he was not entitled to use the Section 301(f) presumption. As a result, Employer's other arguments related to causation, notice, and timeliness of claim need not be addressed.

The majority contends that the dissent would require a claimant to prove actual causation of his cancer. Majority, __ A.3d at __ n.27, slip op. at 29 n.27. The legislature requires the claimant to prove that his cancer is a type of cancer "caused by exposure to a known carcinogen." Section 108(r) of the Act, 77 P.S. §27.1(r). Claimant's expert report stated that "CML is a type of cancer that can be caused by benzene, which is an IARC Group 1 carcinogen found in the firefighter work environment." R.R. at 71. This statement satisfies Section 108(r). However, it was Claimant's separate burden to prove active participation in that firefighter work environment in order to qualify for the presumption. Section 301(f) of the Act, 77 P.S. §414.

MHL-19